MONCURE, P.
delivered the opinion of the court.
Before we consider the merits of this case we will have to dispose of two or three preliminary questions which lie in our way; as,
1st. Whether Mrs. Mary Ann Rerguson, the plaintiff in the suit, was a competent witness to testify therein?
She had a deep and direct interest in the result of the suit, and would undoubtedly have been an incompetent witness therein at common law. If she was competent when she testified it could only have been by reason of the statute contained in the Code, ch. 172, sections 21 and 22, pp. 1109 and 1110. Section *21, among other things, declares that “no witness shall be incompetent to testify because of interest; and in all actions, suits or other proceedings of a civil nature, at law or inequity, before any court,” &c., “the parties thereto, and those on whose behalf such action, suit or proceeding is prosecuted or defended, shall, if otherwise competent to testify, and subject to the rules of evidence and of practice applicable to other witnesses, be competent to give evidence on their own behalf, and shall be competent and compellable to attend and give evidence on behalf of any other party to such action, suit or proceeding, except as hereafter provided, ’’ &c. If that section had stood alone, without the exceptions referred to near the end of it, it would certainly have made the plaintiff a competent witness in this case:
But section 22 embodies the exceptions referred to in the preceding section; and, among other things, declares that “nothing in the preceding section shall be construed to alter the rules of law now in force in respect to the competency of husband and wife as witnesses for or against each other, *301 during' the coverture or after its termination, nor in respect to attesting witnesses to wills, deeds or other instruments; and where one of the original parties to the contract or other transaction which is the subject of the investigation, is dead, or insane, or incompetent to testify by reason of infamy, or any other legal cause, the other party shall not be admitted to testify in his own favor, or in favor of any other party having an interest adverse to that of the party so incapable of testifying, unless he shall be first called to testify on behalf of such last mentioned party,” &c.
The “parties to the contract, or other transaction, which is the subject of the investigation” in this case, *are the parties to the deed of the 19th day of January 1870; which is between Mary Ann Ferguson, widow of the late Thomas Ferguson, of the first xjarE Charles W. Statham and Maria V. his wife, of the second part, John Otey Taylor and Mary B. his wife, of the third part, Beroy S. Edwards and Elizabeth his wife, of the fourth part, and Belia S. Ferguson, of the fifth part; the said Elizabeth Edwards and Belia S. Ferguson being the adult children of Calvin W. Ferguson, deceased. All the said parties to the said deed are parties to this suit; the said Mary Ann Ferguson being plaintiff and the others being defendants therein. And all of the said defendants are husbands or wives; the said Belia S. Ferguson, the only one of them who was sole when the said deed was executed and when the original bill in this suit was filed, having intermarried with Thomas Statham since the institution of the suit, and before the deposition of the plaintiff was taken therein, and her said husband having been made a defendant to the suit. As husbands and wives are clearly incompetent to testify for or against each other, both on the ground of interest and public policy, and as the above named defendants are all directly interested in the result of this suit, it follows as a necessary consequence, that for the legal cause aforesaid, they are, all and each of them, incompetent to testify in this suit. And the plaintiff not having been first called to testify on behalf of the said defendants, could not, legally, be admitted to testifjr in her own favor, and her deposition cannot be considered or read as evidence in the decision of this case.
In the case of Murphy’s adm’or v. Carter, &c., 23 Gratt. 477, it was held by this court, that husbands and wives are not competent witnesses for or against each other; which decided in effect, that the statute *aforesaid did not make them so, though the statute was not expressly referred to in that case.
Several cases were cited in the argument from the New York reports, to show the construction which had been there put upon section 399 of the Code of that state, which declares that “a party to an action or proceeding may be examined as a witness in his own behalf, the same as any other witness. ” In 15 How. Pr. R. 165, and 26 Barb. 612, it was held that the said section did not make husbands and wives competent witnesses for or against each other, while in 19 How. Pr. R. 86, the contrary was held. But that section is radically different from our statute, as it contains no exception in regard to husband and wife, which our statute expressly does; ours being in that respect similar to 6 and 7 Vict., ch. 85, on the same subject. In New York an act has been recently passed (May 10, 1867) enabling husband and wife, or either of them, to be a witness for or against the other, except in certain cases.
When the plaintifE was introduced as a witness in this case, and before her examination was commenced, an exception was taken and written at the head of the deposition in these words : ‘ ‘Defendants by counsel except to the taking of the deposition of Mrs. Mary Ann Ferguson, the plaintiff in this cause, and to the reading of the same, on the ground that she is incompetent to testify on her own behalf, being a party to the contract, the validity of which is in controversy in this suit; and John Otey Taylor and Mary his wife, Charles W. Stat-ham and Maria his wife, B. S. Edwards and Bizzie his wife, and Belia Ferguson (who, since the execution of said instrument, has intermarried with Thomas Stat-ham), parties to said instrument, are incompetent to testify in *their own behalf.” It does not appear that this exception was otherwise brought to the notice of the court below, and it certainly was not expressly passed upon by that court. The counsel for the appellee contended that it was therefore waived by the appellants.
An exception taken to a deposition for want of notice or other irregularity must be brought to the notice of the court at or before the hearing, in order that it may then be passed upon, or it will be considered as having been waived, and will not be noticed in the appellate court. Fant v. Miller, &c., 17 Gratt. 187, 227, 228, and cases there cited. But this principle does not apply to an exception to the deposition of a party to the suit on the ground of incompetency ; and in such a case, though the matter of the exception be not brought to the notice of the court at the hearing, otherwise than by the exception, it may be passed upon by that court, and whether so passed upon or not, it may be passed upon by the appellate court, and the deposition be either read or excluded in the decision of the case by that court as may be proper. 2 Rob. Pr., old ed., p. 337; Beverley v. Brooke, &c., 2 Leigh 425; Mohawk Bank v. Atwater, 2 Paige’s R. 54, 60. We therefore think that in this case, in which the objection to the competency of the witness was that she was a party to the suit, deeply and directly interested in its result, and plainly incompetent by the express term of the statute, this court may and ought to sustain the objection, though the exception to the deposition on that ground, which was written at the head and before the commencement of the deposition, may not have been *302 otherwise brought to the notice of the court below, and may not have been expressly passed upon by that court. *In the case before cited of Murphy’s adm’or v. Carter & als., in which the depositions were excluded by this court, it does not appear that the exceptions taken to them were brought to the notice of the court below, or passed upon by that court.
2. The next preliminary question to be disposed of is, “How far the answers are to be considered as evidence in behalf of the defendants?” They are such evidence only so far as they may be directly responsive to an allegation of the bill, or to a call therein made for a discover}'. In such a case, the answer is not only evidence for the respondent, but it is considered to be true, unless disproved by at least two witnesses, or one and corroborating circumstances. In this case there was no call for a discovery. The defendants had a right, and, indeed, were bound to respond to the material allegations of the bill. By directly responding to them, they had a right to make their answers evidence in their favor as aforesaid. But affirmative allegations in the answers, not directly responsive to the bill, are not evidence for the defendants. These are well settled rules of chancery practice, which require no citation of authority to sustain them. The “narrative of the facts,” as set out in the answer of the principal defendants in this case, is, therefore, not evidence for them, except so far as it may be directly responsive to the bill.
3. Another preliminary question to be disposed of is, “Whether the parties to the deed, which is the subject of controversy in fhis suit, that is, Mrs. Ferguson, and,the other parties to the deed, or any of them, stood in that confidential relation towards each other, which, according to the policy of the law, forbids that the fiduciary should receive any material ^gratuity from one whose interests are entrusted to his care, unless it appears that no undue means or influence were used to induce the gift, and that it was made by the donor voluntarily, and with full knowledge of the nature and extent of the act.
The law upon this subject is fully stated in 1st Story’s Fq. Ju., M 307-323, under the head of constructive fraud. Among the confidential relations there enumerated, as coming within the operation of the principle, we find those of parent and child (including the case of a person who has put himself in loco parentis towards another), attorney and client, medical adviser and patient, agent and principal, guardian and ward, trustee, and cestuis que trust, &c. In treating of the relation of parent and child, the author says: ‘ ‘The same general principles apply to other family relations besides those of parent and child. Thus where three brothers induced their sister, who had a reversionary interest in land, devised by their father to the brothers for life, to release her interest to them without any consideration, except a belief, (the only evidence of which was the recital thereof in the deed prepared by the brothers, ) that the father intended to devise the land to the brothers in fee; this deed was set aside, it appearing that the sister was in a feeble state of health, and had always relied upon the brothers for advice.” Id., I 309 b.
After making the enumeration aforesaid, the author further says: “There are many other cases of persons, standing in regard to each other in the like confidential relations, in which similar principles apply. Among these may be enumerated the cases which arise from the relation of landlord and tenant, of partner and partner, of principal and surety, and various others, where mutual agencies, rights and *duties are created between the parties by their own voluntary act, or by operation of law. But it would occupy too much space to go over them at large, and most of them are resolvable into the principles already commented on. On the whole, the doctrine may be generally stated, that wherever confidence is reposed, and one party has it in his power, in a secret manner for his own advantage, to sacrifice those interests which he is bound to protect, he will not be permitted to hold any such advantage. Id., % 323.
In treating of the relation of trustee and cestuis que trust, the author says: “In short, it may be laid down as a general rule, that a trustee is bound not to do anything which can place him in a position inconsistent with the interests of the trust, or which have a tendency to interfere with his duty in discharging it. And this doctrine applies not only to trustees, strictly so called, but to other persons standing in a like situation, such as assignees and solicitors of a bankrupt or insolvent estate, who are never permitted to become purchasers at the sale of the bankrupt or insolvent estate. It applies, in like manner, to executors and administrators, who are not permitted to purchase up the debts of the deceased on their own account, but whatever advantage is thus derived by them, by purchases at an undervalue, is for the common benefit of the estate. Id., § 322.
We think the case now under consideration clearly comes within the operation of the principles above set forth. The only parties entitled to the large estate of Thomas Ferguson, deceased, besides his widow, were his only children, Maria V., the wife of Charles W. Statham, and Mary B., the wife of John O. Taylor, and the seven children of his deceased son, Calvin W. Ferguson. The said Charles W. Statham *and John O. Taylor, his sons-in-law, were named' his executors in the paper which he intended for his will, but which was rejected by the court of probate, because unduly attested; and after the said rejection they were appointed, and qualified as his administrators, by the consent of the widow. He and she lived together as husband and wife for thirty-three years, and lived hap *303 pily in that relation. She had no children of her own. At the time of his death, his family consisted, besides his wife, of his daughter, Mrs. Mary B. Taylor, and her said husband, and his said grandchildren, or most of them. His other daughter, Mrs. Statham, and her said husband, lived in an adjoining tenement, which it seems she had received as an advancement from her father. Between the widow and her two daughters-in-law and their husbands the most affectionate relations appear to have subsisted. It was natural and reasonable, therefore, that after the death of her husband the widow should look up to her said sons and daughters-in-law for counsel and advice, and that they should have great influence with her. She called them her children, and they, or the daughters at least, called her mother. She had no blood relation living with her. Under these circumstances, certainly such a relation existed between these two administrators of Thomas Ferguson and his widow as to bring the case within the operation of the principle before stated. They had in their hands, or within their power and control, personal estate of their intestate to the amount of from sixty to one hundred thousand dollars, to one-third of which the widow was entitled absolutely ; and she had the utmost confidence in them, evinced by her renouncing the administration of her husband’s estate (to which she was by law entitled) in their favor.
And now, having disposed of these preliminary questions, we proceed to consider the case upon its merits. Ought the decree of the Circuit court, annulling the deed in controversy, to be affirmed or reversed?
There can be no doubt but that it was legally competent for Mrs. Ferguson, at any time after her husband’s death, to have disposed of her interest in his estate according to her pleasure, either by selling or giving aw'ay it or any part of it; provided, she knew perfectly well what she was doing, and what was the nature and effect of her act, and was not induced to do it by any fraud or undue influence. And the only question therefore is, whether, when she executed the deed in question, she had such knowledge, and executed it without being induced to do so, as aforesaid. The burden of proving that she had such knowledge and so executed the deed devolves on those who claim the benefit of it, and especially on Charles W. Statham and John O. Taylor, the administrators of Thomas Ferguson, deceased; and the facts aforesaid ought to be clearly proved.
Mrs. Ferguson was clearly entitled at the death of her husband, legally and morally, to one full third of his personal estate, absolutely, after the payment of his debts; and to one full third of his real estate during her life; and it was out of the power of her husband, by his will, to deprive her of it, or to compel her to accept in lieu of it ’such portion of his estate as he might choose to give her; and this right is entirely independent of the question, whether he acquired any and what estate by his intermarriage with her, or in her right since the marriage ; as to which facts the record affords no evidence. It does not appear that her husband ever intended to deprive her of that *right, and it is not probable that he ever did; for he seems to have been a very just man, and to have had due affec-ion for and confidence in his wife. He certain^ intended to make a will giving her less of his estate than the law would give her; but he no doubt knew that she would have the right to renounce that provision of his intended will and take what the law gave her; and that she would have one year after his will should be recorded to make up her mind whether to elect the one or the other. He doubtless knew that she could not, by any act done during the coverture, bind herself to accept that provision in lieu of what the law would give her; and he, doubtless, would not have desired that she should if she could. He was willing to give her the right of election, to be exercised after she became discovert and free from disability and from the marital influence, and after she had ample time to inform herself fully of the facts necessary to enable her to make a wise and discreet election. In making the deed, therefore, she must be considered as having disposed, or attempted to dispose, of property which was as absolutely hers, in law and equity, as if she had acquired it by her own labor or inherited it from her own father. That she acquired it from her husband, who intended by his will to make a sufficient provision for her support may have been a strong inducement with her to give it the same destination that he intended to give it, and to accept, in lieu of it, the provision he intended to make for her; in other words, to set up his intended will. And if, with full knowledge of the extent and nature of her rights, and without any undue influence, she had voluntarily done so, we might well have said, in the language of Judge Garland, that “her regard for the wishes of her husband were honorable to her. ’ ’ But the question *is, did she execute the deed voluntarily, with such knowledge and without such influence? and that question we proceed now to consider.
The first thing that strikes our minds in this investigation is, the extraordinary haste which occurred in the execution of so important an act, and the circumstances attending its execution. Thomas Ferguson died on the 8th day of January, 1870, and was buried on the 11th of that month. On the next day, the 12th, his papers were examined in the presence of his family, including his widow; and his will was read in her hearing, and, with his other important papers, was entrusted t'o the keeping of T. C. S. Ferguson, a friend of the familj'. At that time it was not known that the will had not been duly attested. A day or two thereafter, however, that fact was discovered by the two gentlemen named in the will as executors, on a conversation with *304 the attesting' witnesses; and they were advised that the will could not be recorded, but that they had better offer it for probate and let it be rejected, and then it would be necessary to have administration taken on the estate. They were told by their counsel that the widow had precedence in the matter as administrator, and were asked by him “what were her views on the subject; whether she wished to take the administration.” They said “she did not; she did not regard herself capable of administering the estate, and did not wish to enter into it.” Now at this time she had not been informed that the will could not be recorded, and that administration on the estate would be necessary; and of course could not have declined to undertake the administration. So that Messrs. Statham and Taylor, in the above mentioned communication which they made to their counsel, *Major, now Judge, Garland, undertook to speak for her what they no doubt anticipated, from their knowledge of her, would be her sentiments on the subject. Their counsel, on being informed by them that the widow did not wish to undertake the administration, told them it would be necessary for her to certify that fact to the court in writing. They asked him then to prepare the writing, which was accordingly done. On his way to the court-house from his office, on the 14th of January, Judge Garland called on the widow, Mrs. Rerguson; “told her that the will could not go to probate, stating what the defect was; that she had priority of administration if she chose to exercise it. She answered that she was old and infirm, and did not wish to take the administration; that she had entire confidence in Messrs. Statham and Taylor, and desired that they should take the administration. ” Judge Garland then read to her the paper that had been drawn; after which she signed it, and he, at her request, witnessed it. After reading the paper, he told her that it should be witnessed, and asked her if he should witness it; and she said “yes.” He “gave her no advice about it, whether to take the administration or not; simply that she had a right to it.” The foregoing account is taken from the deposition of Judge Garland, who was examined as a witness for the defendants. After stating, in his answer to the 6th question, what occurred at the time of the execution of the paper as above mentioned, he says: “This is all that passed upon that or any other subject at that time, that I have any recollection of.” But in his answer to the next (the 7th) question, he says: “She, at the conversation alluded to, expressed her regret that the probate of the will had failed.” It had not *then failed, for the will had not then been offered for probate. On the same day on which the said paper was signed, to wit, the 14th day of January, the will was offered for probate and rejected, and Statham and Taylor were appointed and qualified as administrators.
In regard to the deed in controversy, which was executed by Mrs. Rerguson, and most of the parties thereto, on the 19th day of January 1870, Judge Garland gives the following account of it, and of its execution, in his answer to the 9th question of the defendants: “I was present at the time of the execution of that deed. Previous to its execution I had no connection with it. I had no hand in its making or advising the execution of the contract, or anything to do with it. One or two evenings before the execution of the deed, there was a pencil note on the slate at my office, requesting me to go that evening to the store of Bee & Taylor, which I did. When I got there, Mr. Taylor told me that Mrs. Rerguson had expressed a desire to carry out and execute the will of her husband, if it could be legally done, and asked me if it could be done. I told him that I thought it could be done bj’ a deed between the adult parties, and through the instrumentality of the court as to the infants. He then told me that that was the opinion of Mr. Blackford, and that he had requested Mr. Blackford to prepare a deed, and to take the necessary steps in court as to the infants; but that he wished me to see and examine the deed before it was executed. The next day, or the day after (I don’t distinctly recollect which), the deed was brought to me, and I examined it, and approved it, with a slight alteration. I was then requested to attend at Mrs. Rer-guson’s that evening, or the evening after, at 7 *o’ clock, for the purpose of reading and explaining the legal effect of the deed to her. I went according to the appointment; but before I went into Mrs. Rerguson’s room, I suggested to the parties that they had better get two or three of the neighbors, in whom all of them had confidence, to see that the whole transaction was fair and proper; and according to this suggestion Dr. Banghorne and Mr. Thaddeus Rerguson were sent for, and came. We went into Mrs. Rerguson’s room, and I told her what I had come for. Before reading the deed, I told her what were her rights under the will, and what were her rights by law in case the will was set aside. I told her also, that by executing the deed, she would sustain a considerable pecuniary loss. She answered that she was aware of that, but she wished to execute the will of her husband; that it was his estate; she was satisfied with the provision for her, and wished the rest to go as he desired it. I most think I told her that the executors estimated the personal estate at from sixty to seventy-five thousand dollars, of which she was entitled to one-third absolutely. I then proceeded to read the deed, clause by clause. At the end of each provision I asked her if she understood it, and she answered that she did, until it came to that provision in which she relinquished her interest in Mr. Rerguson’s estate. When I read that, she asked me, ‘ ‘What? Do I relinquish all my interest in my husband’s estate?” I answered by no means, it only relinquished that portion of the estate which' was not given to her by the will. She *305 seemed satisfied, and I finished reading the deed. I think I then repeated the reading. I am not so distinct in my recollection about that, but I think I did. X then asked her if she was satisfied; she said she was; and took the pen and ink and sat *down at her table and subscribed her name to it. I gave her no advice, whether to sign the deed or not; nor was I asked any. After the deed was executed, and attested, and closed, some little conversation ensued, in which I remarked to Mrs. Ferguson, that I thought her regard for the wishes of her husband were honorable to her; and I left. After that I had nothing to do with the matter whatever: and that is the whole agency I had in the matter. ’ ’
In answer to the next (10th) question by the defendant he said: “I think somebody said (I don’t recollect who it was) that the executors estimated the real estate at $40,000. I said I thought the estimate was too high. ” In answer to the defendants’ 15th question, viz: “From Mrs. Ferguson’s demeanor on that occasion, did you have any doubt that she heard your explanation and reading?” he answered, “I believed at the time that she distinctly understood it. From the relevancy of her answers to my questions, and from what she said, I was satisfied she understood it; but I can’t undertake to say she did. It was my belief at the time that she did, and my belief now. I sat close to her when I read the deed, and read it in a loud voice. I saw nothing in her demeanor that indicated she was ignorant of it or did not hear it. ’ ’ In answer to the defendants’ second question the witness said: “I was acquainted with Mr. Ferguson from near about the time I came to Fynchburg, in 1841, till his death. Our relations were friendly, and for about the last ten years I was his legal adviser. I wrote three wills for him.” And in answer to the fifth question he said: “The will offered in January last was written by my daughter, Mrs. Christian, from a draft taken by me. After it was written and before its execution, Mr. Aurelius Christian, my partner, delivered x'it to Mr. Ferguson, and I did not see anything more of it until it was presented in court for probate.”
On his cross-examination by the plaintiffs’ counsel, Judge Garland said that Mrs. Ferguson never did, in any matter or manner whatever, retain him as counsel; that before the will was offered for probate, Messrs. Statham and Taylor, the executors of the will, engaged the services of Mr. Christian and himself as counsel for the estate, and as such he offered the will for probate as before stated; that he regarded himself as counsel for the estate until the 14th of April 1807, when he was appointed judge of the Corporation court of Fynch-burg; that in relation to the transaction .of the deed, he had not been spoken to as counsel; the only thing he had to do with it was to give an opinion in relation to the deed, after Mr. Blackford had prepared it. All he had to do or was asked to do, was to examine the deed and see if it were sufficient to carry out the object of the parties. He did not receive nor charge a fee for that service. Mr. Statham or Mr. Taylor, or both, handed him the deed which had been prepared by Mr. Blackford, and he examined it and suggested some alterations in one part of it. The deed was then carried back to Mr. Blackford, who prepared another deed according to that suggestion, which other deed was brought to him, and is the same deed which bears date and was executed on the 19th of January 1870 as aforesaid. The alteration he suggested in the first draft of the deed was in relation to the provision wherein Mrs. Ferguson relinquished her interest in her husband’s estate. He thought that such relinquishment was not sufficient to pass her entire interest. Being asked if his answer to the sixth question-in-chief, referring to what took place at the time of the execution of the *deed by Mrs. Ferguson, contained a statement of all that he said to her or she said to him on that occasion, he answered, that it was not all, but was substantially all that passed with reference to the business on which he went, with the exception that he told her that if the will was set aside' she would get one-third of Mr. Ferguson’s real estate for life. In answer to a question as to the length of time which elapsed from the time he commenced reading the deed to Mrs. Ferguson until she signed it, he answered: “I have no distinct recollection of the time; I think it may have been from three-quarters of an hour to an hour. I think I read it over twice. I read it slowly and distinctly. I don’t say positively, but I have a pretty strong impression that I read it over twice.” In explanation of his answer to the seventh question-in-chief, he said: “If that answer imports that she said that the will had been offered for probate and failed, it was certainly not what I intended to say. I am not mistaken in the fact that she expressed her regret that the will could not. go to probate. ’ ’
We have stated substantially the most material part of the evidence of Judge Garland, especially in regard to what transpired at the time of the execution of the deed in controversy, because his testimony is the most important in the cause, and his connection with the subject enabled him to testify in regard to nearly all the facts which we deem it material to notice in this opinion. Other witnesses were examined, some of them in behalf of the plaintiff and some in behalf of the defendants. The plaintiff herself was examined in her own behalf at very great length; but we have already expressed the opinion that she was an incompetent witness, and therefore excluded her testimony.
Dr. Payne, one of the plaintiff’s witnesses, had *known her nearly forty years, and had sometimes prescribed for her. He said her probable age was upwards of sixty. Her health was feeble. She was very nervous, and very deaf. According to his knowledge of her case, *306 and her deafness, it is difficult to make her understand ordinary conversation. The deed in controversy (an instrument of some twelve pages in length) being shown and read to him, and being asked, from his knowledge of her nervousness and deafness, to say whether or not he believed she could intelligibly have comprehended the legal meaning and.import of the instrument from a single reading of it in her presence, by the counsel of the parties interested in procuring its execution by her, without ever having before seen or known of its existence, he answered: “If she had heard as well as I do, I think it would have been scarcely probable that she would have comprehended it in one reading; and taking into consideration the nervous condition, in which she was, together with her deafness, to have understood the paper from hearing it read once, would amount to almost an impossibility. ’ ’
Dr. Banghorne and Mr. T. C. S. Ferguson were invited by the administrators to be present at the execution of the .deed, and attended accordingly. Judge Garland, before he read the deed to Mrs. Ferguson, suggested that two disinterested persons, friends of the family, should be sent for to witness the proceedings; and when Messrs. Banghorne and Ferguson arrived, he supposed they had been sent for in pursuance of his suggestion; but in fact, they had previously been invited by the administrators to attend. Dr. Banghorne was examined as a witness in behalf of the plaintiff.
He stated that he was a practising physician, and a near neighbor of *the late Thomas Ferguson, and was well acquainted with the plaintiff; supposed her to be from sixty to sixty-five years of age; regarded her as rather a delicate woman; would say, from general observation, that she was rather a nervous person. She was very perceptibly deaf. It was difficult, but not by any means impossible, to communicate with her intelligibly by such efforts as are practicable in ordinary social intercourse. He was present when the paper referred to was signed by Mrs. Ferguson; had been invited by Mr. Statham to hear a paper read by Major Garland of interest to that family, Mr. Statham believing that it would be agreeable to Mrs. Ferguson for him (the witness) to attend. He attended about 8 o’clock P. M. When he entered Mrs. Ferguson’s room, Mrs. Ferguson, Major Garland, Mr. John O. Taylor and Mrs. Taylor, Mr. and Mrs. C. W. Statham, Misses Selina and Delia Ferguson, Mr. T. C. S. Ferguson, and Messrs. Christian and Mayo, notaries public, were present. Did not remember that any one else came before the instrument was read and signed. Being asked on his examination in chief, “Was the plaintiff dressed in her usual manner when in company, or in apparent haste, and in such manner as at the time to attract your observation, or somewhat your surprise?” he said: “I don’t remember ever seeing Mrs. Ferguson dressed in that manner in company before. The dress was suitable for the place, her chamber; it being a calico wrapper. I can’t say I was surprised at her dress; but after going home I remarked that the old lady must be much distressed, as she was not dressed with her usual care in the presence of strangers.” In answer to other questions propounded to him on his examination in chief, he made substantially the following statements. ^Before reading .the paper, Major Garland stated that he was about reading a paper having for its object the carrying out of Mr. Ferguson’s wishes, as expressed in his will, inasmuch as the will itself could not be executed, or words to that effect — that all parties, he believed, were desirous of carrying out Mr. Ferguson’s wishes, and that this paper had been prepared to effect that object. The general scope of his words was to that effect. At one time during the reading of the paper, Mrs. Ferguson interrupted Major Garland with an inquiry to this effect: “Am I to give up all my interest in the real estate?” Witness could not remember very distinctly the Major’s answer, but he stated something in regard to carrying out the object of the will, and intimated that when she heard him read further she would understand it. Witness did not remember that there was anything very definite said in regard to her legal rights. He was very confident there was no distinct effort made to set forth the legal rights of Mrs. Ferguson or the heirs, in consequence of Mr. Ferguson’s will not going to probate. Did not remember that anything was said in regard to the value of the estate, nor did he think there was anything said as to the relative values of the real and personal estate.
On his cross-examination Dr. Banghorne, in answer to questions propounded to him by counsel for defendants, said: Mrs. Ferguson was a lady of good ordinary average intelligence. Her manner on the occasion of the execution of the deed was her usual manner. Witness remembered no appearance of surprise or disturbance. In reading the deed and conversing with her about it, Major Garland raised his voice and spoke as a person would speak to one that is deaf, trying to make him understand. Major Garland’ s*is a very audible voice, though not of unusual distinctness. Mrs. Ferguson exhibited no reluctance or aversion whatever to executing the deed. She seemed to appreciate exactly what she was doing. She said she understood the deed. Either when the whole had been read or when the clause during the reading of which she interrupted Major Garland had been read, it was suggested that it be read over again, or Mrs. Taylor, witness thinks, suggested that she read it herself. She replied that she understood it perfectly, and a re-reading was not necessary, or words to that effect. Witness, after having his memory refreshed by the questions p.ut to him, stated, that at some time before or after the reading, Major Garland remarked *307 that Messrs. Statham and Taylor had valued the real and personal estate of Mr. Ferguson in accordance with the figures mentioned in the question to which this statement was an answer (the personal estate at about $75,000 an¿ the real estate at about $40,000 in value), but that he, Major Garland, thought they had placed too high an estimate upon it. This remark of Major Garland was addressed to the whole company ; not more to Mrs. Ferguson than to the other persons present. It was made so that she might have heard it, and it was intended that she should hear it, at least witness so supposed; it had that appearance. Witness could not say that she heard it, or that she heard anything. She acted as if she had heard it. He had no doubt but that she heard and understood this and the rest of Major Garland’s remarks. If witness had had any doubt, he would, as a neighbor and friend, have had the paper read over to her again. He was very confident that Major Garland, at some time during the interview, said to Mrs. Ferguson that she would be a loser by signing the *deed, or that she was giving up more than she got, or words to that effect.
On his re-examination by plaintiff’s counsel, witness said: “Mrs. Ferguson listened very attentively to the reading of the paper, and there seemed a disposition on the part of all present, as they were aware of her difficulty of hearing, to enable her to understand what was going on ; the paper was, however, a long and complicated one, and, doubtless, tested very strongly both her intelligence and sense of hearing; but, notwithstanding, she seemed so conscious of what she was doing I cannot help believing she comprehended the meaning of the paper as read to her byT Major Garland, and, so far as I know, she arrived at this understanding by and through the means of hearing said paper read by Major Garland on that occasion. ’ ’ In answer to another question, witness said: ‘ ‘I thought, at the time, I understood the paper sufficiently to have acted on it, if my own interest had been involved ; though, as a matter of precaution, I think, if I had been brought to act for myself I should have had the paper re-read.”
It appears very clear from the evidence of this witness, that Major Garland w'as mistaken in supposing that he read the paper twice to Mrs. Ferguson. He merely stated it, however, as his impression.
We have stated thus fully the material portions of Dr. Langhorne’s testimony, because he was requested by the administrators to be present when the deed was read to and executed by' Mrs. Ferguson, for the purpose of taking notice of what was said and done on that occasion ; and because he seems to be an intelligent and impartial witness. T. C. S. Ferguson also attended on the same occasion and for the same purpose, by request of the administrators; but it is unnecessary *to make any statement of his testimony, as the material facts to which he testified have already been stated. He was a near relation of Thomas Ferguson, and a near connection of the defendant John O. Taylor; though there is nothing in his testimony, or in the record, which casts any discredit on his veracity. The only other evidence which will be here noticed is that of three receipts given by Mrs. Ferguson to Statham & Taylor, administrators of Thomas Ferguson, deceased; two of them dated February 19th, 1870, one of the two being for $2,000, described as “being part of the sum coming to me under the will of the said Thomas Ferguson, deceased, as per agreement recorded in the Hustings court clerk’s office of Lynchburg” ; the other of the two being for one Virginia coupon bond for $1,000, with all coupons attached from the 1st of January 1869, inclusive, described as “being the same coming to me under the will of said Thomas Ferguson, deceased, ’ ’ &c., as above; and the third dated March 4, 1870, for $3,000, described as “being in full of that portion of the estate of my .late husband coining to me under his will, per agreement filed in the clerk’s office of the Hustings court of the city of Lynchburg.”
In less than three months after the. death of Thomas Ferguson, his widow, the said Mary Ann Ferguson, brought this suit, to have the paper aforesaid, of the 19th of January 1870, decreed to be as to her null and void, and to recover her dower in the real and her full third part of the personal etsate of her said intestate husband.
After making the foregoing statement of all the material facts that are proved in the case, we repeat the question we now have to solve, Did she execute the de.ed in controversy voluntarily, without being *induced to do so by undue influence, and with full knowledge of the meaning and effect of the deed?
She never read the deed, nor was it ever read to her but once, when it was read to her by the counsel of the administrators of her husband; and it was never in her hand but once, when it was handed to her to.be signed. It was prepared by counsel employed by the administrators, and its preparation was completed a short time, perhaps not more than an hour, before it was read to her. Until a short time before it was completed, its details had not been fully agreed upon between the counsel consulted on the subject. It was a paper of considerable length, and it is not probable that she, could have fully understood it upon a single reading under such circumstances. She was very deaf, and must have heard it imperfectly. She was old and nervous, and no doubt wholly inexperienced in business. She was a lady of ordinary intelligence only, and had just lost her husband, with whom she had lived for thirty-three years, during which time it does not appear that she had occasion to attend to business of any kind, except her domestic duties. The only portion of the deed which seemed to strike her attention was that part which related particularly to herself, and that-she certainly misunderstood. The only remark or enquiry she made during the reading of *308 the paper was made when that part was read, and then she asked Major Garland, “What? Do I relinquish all my interest in my husband’s estate?” Or, as Dr. Tang-horne expresses it, “Am I to give up my interest in the real estate?’ ’ The witnesses who were present doubtless believed she understood it, because she said so, and be-cajuse no doubt they believed that the matter had been fully agreed upon between the parties before hand, and that they were only called ^together to attest the formal execution of the papers.
The deed was executed under circumstances, the influence of which upon Mrs. Ferguson it would have been extremely difficult for her to resist. She had just lost her husband, and was therefore in deep distress. She supposed that he had left a will Which had been duly executed, and would in due time be duly admitted to probate. It does not appear that she had ever read the paper which he intended for his will, or been informed of its contents in his lifetime. She- had. confidence in her husband, doubtless, and trusted that he would make due and ample provision- for her in his will. When she heard the paper, which he intended for his will, read to her the day after he was buried, she was not in a condition to- understand how it affected her interest, and she could have had no adequate idea of the' value of hm estate. She had neither timé nór opportunity, if she had been'disposed, to consult with counsel or disinterested friends on the' subject. When, two or three days thereafter, it was ascertained that the will had not been duly attested, and could not be established and recorded, she shared in the surprise which that discovery caused to the family, and it seems also in the impulse by which they were soon moved to set up the will,, if it could be don'e', and give it the same effect as if it had been duly attested, according to the manifest intention of the decedent. That the heirs at law should strongly desire that that should be done is not at all strange, seeing the great benefit they would derive therefrom, except only one of his grandsons, who was excluded by the intended will. Nor was it strange that Mrs. Ferguson should at first be moved by this impulse, before she was' informed that to set up her husband’s will, and accept *the provision therein made for her, would very injuriously affect her interest. She, therefore, no doubt yielded at first to "what seemed to be the strong desire of the rest of the family, and consented to join them in carrying into effect, or at least in setting up as far as they could, her husband’s intended will. She could hardly have expected to be so soon called upon to execute such a paper as that of the 19th of January, 1870, before she could have time or opportunity to inform herself and take proper counsel on the subject. The preparation of that paper, however, must have been very soon commenced after it had been agreed Upon, if it can be said to have been agreed upon by the family, including herself, to set up the will of her husband as far as they could. Probate of the will was rejected, and the administrators qualified on the 14th of January. Several days elapsed in the preparation of the paper, and yet it was concluded and signed on the 19th of January, just five days after the rejection of the will; so that counsel must have been retained to prepare that paper a day or two only after the rejection of the will. Such counsel was retained by the administrators, and all his information in regard to the motives and objects of the paper, must have been derived only from them. Mrs. Ferguson never saw him, and never had any communication with him on the subject. The recital in that paper therefore must have been made by the learned and honorable counsel who prepared it, on the faith of information derived by him from his clients. After setting out in the paper verbatim et literatim, the intended will of Thomas Ferguson, the deed recites: “And whereas said paper was not executed in accordance with all the requirements of the laws of Virginia, and so could not be proved and ^established as the last will and testament of said Thomas Ferguson, deceased; and whereas it is known to the parties of this deed that said Thomas Ferguson departed this life under the belief that said paper would regulate the distribution of his whole estate, real and personal; and whereas it is the earnest' desire of all the parties to this deed, who constituted his family, and the larger part of his heirs at law, that his solemnly declared wishes should, in every respect possible, be carried into effect, according to their letter and spirit: Now, in consideration of the premises, and of the natural love and affection which we bear each other, the respect we have for the memory and wishes of the said Thomas Ferguson, and also the advantage to be derived and enjoyment by each of us, from the arrangement proposed, we, the said Mary Ann Ferguson,” &c. (naming all the other parties to the deed), “do hereby bargain, agree and covenant to declare,, set up and forever establish the aforesaid paper as and to be the last will and testament of said Thomas Ferguson, as fully and to all intents and purposes as if the same had been executed according to the technical forms of the law, and had been duly propounded, proved, established and recorded as the last will and testament of the said Thomas Ferguson by the courts of the country. And we do further bargain, agree and covenant that all the real and personal property, ’ ’ &c.
Now the deed containing these recitals, even supposing it to have been fully understood by Mrs. Ferguson when read to her, was well calculated to strengthen and confirm her first impulse to give effect to the will of her husband, which had failed of effect, as was supposed, only by a technical omission; and also was well calculated, though not designed, *to mislead her into the idea that so far from being injured by, she would actually derive *309 an advantage “from, the arrangement proposed.” She was evidently taken by surprise by the large assemblage in her chamber on the night of the 19th of January, when she was called on to hear the deed read and explained to her, and to sign it. She could hardly have expected to see Major Garland even until a few moments before he was ushered into her chamber. She had put on her “calico wrapper,” when it was announced to her that Major Garland would, in a few moments, call on her. She expressed her willingness to see him, even in her then condition of dress, and had him invited into-her chamber. But soon there came into her room, besides Major Garland and the family (of which there were many in number), Dr. Banghorne, Mr. T. C. S. Ferguson and Messrs. Christian and Mayo, notaries public. In this large company, assembled thus unexpectedly, this long deed containing these recitals, was read by the counsel of the administrators to this deaf, nervous old lady, at night, in her chamber, just eleven days after the death of her husband. There was not in the large assemblage then present one human being besides herself who was not interested against her in the execution of the deed, or who was not invited to be present on that occasion by those who were so interested. Nor does it appear that since the death of her husband she had had an opportunity of seeing or consulting with counsel or disinterested friends on the subject, if she had been inclined to do so. Under the influence of these surrounding circumstances, and in her state of information, or rather ignorance, it is not strange that she joined other members of the family of her husband *in the attempt to set up his will as far as they could. On the contrary, it would rather have been strange if she had not yielded to the pressure, and if she alone of all her husband’s family then present, had been the one who had not sufficient respect for his memory and wishes to induce her to consent to give effect to his will as far as she could.
But the deed was executed by her, not only under undue influence, as aforesaid, but without any definite idea of the nature and value of the estate of her husband, or of the effect of the deed upon her interest, and without having had an opportunity of consulting counsel and disinterested friends on the subject, and placing herself in a condition to be able to choose and act wisely and discreetly in the matter. She probably knew little or nothing of the nature or value of the estate, except that part of it which consisted of realty and the furniture of the house in which she lived. His estate consisted chiefly of money due him in foreign countries, of which there was a large amount, some sixty or seventy thousand dollars, and of which she could have known but little, if anything. It does not appear that she had any curiosity or felt any interest, while her husband lived, to make any enquiry, or that he gave her any information on the subject. It does not appear that she received any such information until the meeting in her chamber for the purpose of having the deed ■ executed, as aforesaid. She certainly received little, if any, on that occasion. Major Garland in his deposition says: “I most think that I told her that the executors estimated the personal estate at from sixty to seventy-five thousand dollars, of which she was entitled to one-third absolutely.” But Dr. Banghorne, who attended on *the occasion at the request of the administrators, for the purpose of witnessing the transaction, in his deposition says: ‘ ‘I don’t remember that there was anything very definite said in regard to her legal rights. I am very confident there was no distinct effort made to set forth the legal rights of Mrs. Ferguson, or the heirs, in consequence of Mr. Ferguson’s will not going to probate. I do not remember that anything was said in regard to the value of the estate; nor do I think there was anything said in regard to the relative values of the real and personal estate.” To be sure, this witness afterwards said on cross-examination, after having his memory refreshed, that “at some time, before or after the reading, Major Garland remarked that Messrs. Statham and Taylor had valued the real and personal estate of Mr. Ferguson,” the former at about $40,000 and the latter at about $75,000; but that “he thought they had placed too high an estimate upon it.” The witness further says, however, that this remark was addressed to the whole company, not more to her than to the other persons present; though it was spoken loud enough for her to hear, and was intended to be heard, and, he believes, was heard by her; but he could not say that she heard it, or that she heard anything. If this was all the information she had, and it is all that the record shows she had, in regard to the value of the estate, it was certainly not sufficient to make the deed which she executed a valid deed as to her, unless it clearly appears that without being induced to do so by any undue influence, she voluntarily determined to execute the deed, however great the value of her interest in the estate might be; and this certainly does not appear.
But she must have been ignorant at the time of the ^execution of the deed by her, of other facts which it was necessary for her to know in order to render the deed valid as to her. It does not appear that she knew, and she doubtless did not know, that the law gave her one-third of the personal and real estate which her husband left at his death, the former absolutely and the latter during her life; which he had not the power, by his will to take away from her, without her consent freely given after his death; and that if his will had been duly executed and recorded the law gave her a right at any time within one year from the time of the admission of the will to probate, to renounce the provision therein made for her, and to take, in its stead, the provision made for her by law. *310 She may have supposed, and doubtless did suppose, that her husband had a right to dispose by will of his own personal estate, at least, according to his pleasure; and she may have been willing to give effect to his intended will, notwithstanding its defective attestation, although it gave her much less than one-third of his personal estate, while she would not have been willing if she had known how much of said estate the law gave her and how it was secured against his power to dispose of it by will, without her consent as aforesaid. Here, then, are two-important facts which were doubtless unknown to her when she signed the deed. First: Her right to have one-third of his personal estate, notwithstanding his will to the contrary; and secondly: her right, at any time within one year after the probate of the will, to make her election between the provision made for her in the will and that portion of the estate to which she was entitled by law. Had she known both of these facts, even though she may have been inclined, at the time she was called on to sign the deed, to set up and abide by her husband’s *will, she might well, and doubtless would, have declined signing the deed at that time, and availed herself of the same ‘ opportunity to obtain the necessary information and make up: Her mind, which the law would have afforded her if the will had been duly executed and recorded. She would then have seen that there could be no-good reason for placing the matter on any different ground in this respect from that which would have existed if the will had been admitted to probate. The only idea which she seems to have had of the meaning and object of the deed was to set up and establish, as far as could be done, the will of Thomas Ferguson, and give to it the same effect, as if it had been duly executed and admitted to probate; and she seems to have had 'no idea; that she was thereby giving away her own property, to the amount of twenty-odd thousand dollars. And no sufficient explanation, on that subject, was made to her.
Again, it does not appear that she knew, and- doubtless she did not know, 'that though her husband’s will was not duly executed and admitted to probate, she might at any time; if shé chose, give effect to it, to the extent of her full legal portion of the estate or any part thereof, by deed or by will, executed at any time during her life. So that, if she had but known it, she had the whole matter in her own hands, and might have disposed of it deliberately and advisedly, instead of hastily and ignorantly, as she seems to have done. She probably did not know the difference between disposing of her property by deed and by will; that the former was irrevocable, while the latter would have been ambulatory and revocable till her-death.
- - How, upon all these subjects she needed • ■ -information and the advice of counsel and of disinterested friends; *and she needed time to obtain them. The law presumes that a widow in such case stands in such need, and therefore it gives her one year to obtain such information and advice, so that she may make her election wisely and discreetly. She has just emerged from a state of disability, during which she has had no occasion to judge and act for herself, because she has had a husband to judge and act for her in all matters affecting her temporal welfare. She is presumed to know little or nothing about his property or his business ; and the law, in its wisdom and humanity, considers that one year is not too much time to give her for obtaining the information and advice she so much needs. In the case now under consideration, the deed was signed by the widow just eight days after her husband was buried. By it she professed to give away her full portion of her husband’s estate, except that part which he intended to give her by his will; the amount thus given away being not less than twenty or twenty-five thousand dollars. During the short interval between the death of her husband and the signing of the deed by her, she remained in his last residence, surrounded by his children and grandchildren, who alone were to; be benefited by the execution of the deed. It does not appear that one of her own next of kin was with her during that interval; but, at all events, not one of them was present when she signed the deed. It does not appear that she consulted counsel, or advised with a single disinterested friend on that subject, or was advised by anybody to do so.
It was the duty of ' the administrators of her husband, invested as they were by law with the title to his whole personal estate, - and standing as they did in the confidential relation in which they stood towards *her, to take care that before she made a donation of her ' estate, or a large portion of it, to themselves, as she did, she should be fully informed of her rights on the subject, and the effect of her act, or at least should have ample time and opportunity to consult counsel and advise with disinterested friends; and they should have advised her to avail herself of those ádvan-tages. That uberima fides, which the law expects and exacts of persons standing in such a confidential relation to another, required them to do so. Instead of doing so, if they did not advise and encourage, they, at least by their acts, facilitated the preparation and execution of the deed, when they must have known that she had not the necessary information and proper advice to enable her to act wisely and discreetly in so important a transaction.
We have referred to very little authority in support of the views we have expressed, because we think the principles of law and equity which govern the case are very well settled. Besides, Story’s Fq. Ju., to which we have already referred, the case of Huguenon v. Basely, 14 Ves. R. 273, in 3d Leading Cases in .Equity, top pages 94-153, edition ' of 1859, with the English and American notes appended, may be referred to as containing almost all the law which *311 is extant upon the subject. We would refer specially to some of the cases, but for the great length to which this opinion has already been extended. We think, however, we can safely say, that though perhaps no case can be found precisely like this in its main features, yet not one of the cases is in conflict with this opinion, while many of them strongly support and sustain it.
In regard to the receipts which were given by Mrs. Ferguson to the administrators of her husband for the *legacy intended to be given to her by his will, and which were relied on as confirmation of the deed signed by her, those receipts were given very shortly after the deed was signed, under the same influence under which the deed appears to have been signed, and when she remained, so far as appears from the record, still uninformed as to her rights; or, if so informed, she doubtless supposed that the deed would be binding upon her. They cannot therefore have the effect of such a confirmation.
For the foregoing reasons we concur in the opinion of the Circuit court, that the paper writing in the bills and proceedings mentioned, of the date of the 19th day of January, 1870, was made under such circumstances as to render it invalid, and of no binding force or effect against the said Mary Ann Ferguson; and that it ought in equity to be set aside, whether any actual fraud was intended or perpetrated on her in its procurement or not; (a question not deemed by this court any more than by the said Circuit court, necessary to be decided) ; and we therefore affirm the decree of the said Circuit court.
STAPI/FS, J. concurred in the opinion, except as to the competency of Mrs. Ferguson as a witness. He had not examined that question, and expressed no opinion upon it.
Decree affirmed.